IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 29, 2012 Session

## IN RE FRANKIE V. ET AL.[1]

**Appeal from the Juvenile Court for Putnam County**
**No. 1032TPR     John P. Hudson, Judge**

_____

**No. M2011-01981-COA-R3-PT - Filed May 24, 2012**

_____

Upon petition by the State of Tennessee Department of Children's Services and following a trial, the Putnam County Juvenile Court terminated father's parental rights to his three minor children. We affirm because there was clear and convincing evidence to support the trial court's decision and because there was clear and convincing evidence that termination was in the children's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Samuel J. Harris, Cookeville, Tennessee, for the appellant, James W.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Marcie E. Greene, Assistant Attorney General; for the appellee, State of Tennessee, Department of Children's Services.

Rebecca E. Brady, Cookeville, Tennessee, Guardian Ad Litem.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Penny V. ("Mother") and appellant James W. ("Father") are the biological parents of minor children Frankie, Jenny, and Penny. In December 2009, the Department of Children's

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Services ("DCS") received a referral regarding a drug-exposed child. Upon investigation, DCS learned that Mother had been giving the children unprescribed prescription drugs (Seroquel) at bedtime to make them sleep. DCS's investigation further revealed that Mother's older son, Ricky, had been sleeping unsupervised in the same room as the children, in violation of a non-custodial permanency plan that she had signed on November 5, 2009. Ricky had taken nude photos of his younger twin sisters, Jenny and Penny, and was on probation for having sexually abused a 12-year-old girl. Thus, DCS took emergency custody of Frankie, Jenny, and Penny on December 4, 2009.[2] Father was living in the same home as the children and Mother when the children were removed.[3]

After the children's removal from Mother and Father and placement into a foster home, DCS made efforts to reunite the family by, for example, arranging for Mother and Father to receive non-offender sex abuse counseling, assisting Father to search for employment, making a referral for Mother and Father to obtain in-home parenting education, providing therapeutic visitation,[4] notifying them of appointment dates and times, and remaining in contact with service providers to monitor progress.

DCS also developed several permanency plans[5] for the children, and the court found their requirements to be reasonably related to remedying the conditions that necessitated foster care. The permanency plans required Father to enroll in non-offender sexual abuse counseling to learn to be protective of his children and not to allow for their further abuse, properly supervise the children at all times and not to allow them to be around Ricky at any time without approved adult supervision, sign releases of information so DCS could track his progress in programs, maintain a residence free of safety hazards, pests, and rodents, maintain utilities for six consecutive months and provide DCS with proof of payments, allow DCS to make random home visits and to inspect all rooms, provide DCS with proof of income, enroll in and successfully complete parenting education, demonstrate the ability to properly parent and supervise the children, learn the dangers of giving the children

---

[2] *See* Tenn. Code Ann. §§ 37-1-113 and -114.

[3] The children had been removed previously from Mother and Father and placed in foster care in 2006.

[4] According to the testimony at trial, therapeutic visitation is "where a trained individual is there to try to assist [the parents] in how to properly parent the children."

[5] Our statutes require the development of a plan of care for each foster child. Tenn. Code Ann. § 37-2-403(a). The plan must include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2).

unprescribed medication and agree not to do so in the future, submit to an alcohol and drug assessment and follow its requirements, submit to random urine and hair follicle drug screens, not associate with persons under the influence of drugs or alcohol, participate in therapeutic visitation requirements, ensure that the children have clean clothes to wear, ensure that the children bathe daily and wash thoroughly, participate in and cooperate with LifeCare Family Services, ensure that the children are nightly sleeping in their respective areas, successfully complete boundaries counseling through LifeCare, participate in mental health case management services with LifeCare, encourage the children to complete all school work, attend all of the children's educational meetings, ensure that the children have required immunizations, ensure that the children attend all medical and dental appointments, not allow registered sex offenders around the children, obtain and maintain legal income to support the children, prepare a monthly budget with DCS, attend all court hearings, attend all child and family team meetings and provide a doctor's excuse when absent, participate in the children's mental health appointments when deemed necessary by the provider, protect the children by not allowing anyone under the influence of drugs or alcohol to be around them, and provide the children support such as money, food, clothing, and personal items.

On August 26, 2010, the trial court adjudicated the children dependent and neglected within the meaning of Tennessee Code Annotated section 37-1-102(b)(12) and made the dispositional finding that they should remain in foster care. Nevertheless, on October 28, 2010, the court allowed the children to return to their parents' home for a 90-day trial home visit. In granting the trial home visit, the court ordered that the children were to "receive counseling to make them aware of inappropriate actions" and ordered Mother and Father to continue to cooperate with DCS and any services it provided or referred them to, not allow Ricky to live in the home or be around the children unsupervised at any time, ensure that Frankie slept in his own room and the girls slept in their own room, and ensure that the children had proper hygiene. Neither Mother nor Father met the conditions of the trial home visit, so the trial court terminated it by order entered January 7, 2011.[6] The court found that

---

[6] The trial court later noted:

[t]hen, you know, we go through a period of time and we work with the family and we give them the benefit of a trial home visit. The court did so with the recommendation of [DCS]. But, you know, these trial home visits are always somewhat problematic and I can't say that I granted that with a great deal of confidence. You always hate to, but sometimes there [are] just a lot of things to overcome for there to be success in a trial home visit and we just never accomplished that. And just within a relatively short period of time those children were removed and they were removed for a variety of reasons–because of the poor hygiene, the head lice, the mother asking for medication to help the children sleep, which is cause going back to that original removal issue. They had no issues in foster care. There w[ere] multiple people staying in the home, including this young lady who is on federal probation and has

(continued...)

the reasons the trial home visit was terminated were the children having head lice, poor hygiene, the children's grades slipping, the mother reporting that the children were asking her for medication to help them sleep, even though they had n[o] problems sleeping in the foster home, multiple people staying in the home,[7] including a grown sibling who abused crack cocaine in the home, and mother not attending meetings scheduled by DCS to address problems during the trial home visit.

The children have remained in continuous foster care since January 7, 2011.

On May 2, 2011, DCS filed a petition to terminate Mother's and Father's parental rights to Frankie, Jenny, and Penny. Trial was held on August 11, 2011.[8] By final decree entered August 12, 2011, the court terminated Mother's and Father's parental rights on the grounds of abandonment (Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii)), substantial noncompliance with the permanency plans (Tenn. Code Ann. § 36-1-113(g)(2)), and persistence of conditions (Tenn. Code Ann. § 36-1-113(g)(3)). The trial court also found that termination was in the children's best interests.

Mother did not appeal the termination of her parental rights. Father appeals from the August 12, 2011 final decree.

ISSUES

Father presents three issues for review which we summarize as follows: (1) Whether the trial court erred in admitting hearsay testimony; (2) Whether the trial court correctly found by clear and convincing evidence that Father's parental rights should be terminated on the ground of abandonment; and (3) Whether the trial court correctly found by clear and convincing evidence that Father's parental rights should be terminated on the ground of substantial noncompliance with the statement of responsibilities in the permanency plans.

---

[6](...continued)
a drug abuse problem.

[7] Because Mother and Father allowed multiple people to stay in the home, the children had to sleep together in violation of the permanency plan and the court's October 28, 2010 order.

[8] The testimony, evidence, and findings of fact from trial will be summarized in greater detail below as relevant to the issues on appeal.

STANDARD OF REVIEW

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Pursuant to Tennessee Code Annotated section 36-1-113(l)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, M2004-00999-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *Id.* at 654. As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

ANALYSIS

I. Hearsay

Father argues that the trial court improperly admitted hearsay testimony and that therefore, "DCS did not establish a basis for termination with sufficient, clear, and convincing evidence." Over Father's objection, the trial court permitted Lauren Coffman, the DCS family services worker, to testify as follows:

> A: I received reports from teachers saying that the children were unclean, reports from the health department saying the children *did have lice*. I also received reports that [Mother's older daughter, Chastity,] was in the home of a known drug user.[9] She had been residing in the home and I confirmed that with a federal probation officer that she had claimed that residence as her place where she lived. So, there was not enough room already for the children to have room to sleep separately. And with [Chastity] living there the children would have to sleep together. And that was an issue as well. Because there are issues with boundaries between the children regarding sexual issues of that nature. Due to all those concerns we ended the trial home visit and the children were placed back into the previous resource home.

(emphasis added). Even if we were to accept Father's argument that the above testimony contained hearsay and that the trial court erred in admitting it, we find that any error in the admission of the testimony was harmless. Pursuant to Tenn. R. Evid. 103(a), "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ." By his own testimony, Father admitted that the children had lice and that Chastity was living in the home[10]:

> Q: So that's why they were missing school while they were on the trial home visit?
>
> A: Right.

_____

[9] The testimony of Dreama Neely, a DCS case manager who was assigned to Chastity's case, confirmed Ms. Coffman's testimony regarding Chastity's drug abuse. Ms. Neely is also the case manager for one of Chastity's children who is in foster care, and she testified that the child was born addicted to drugs.

[10] Later in his trial testimony, Father again admits that Chastity was living in the home with Frankie, Jenny, and Penny.

Q: Because of the head lice?

A: Right.

. . .

Court: You were living in [Mother's] trailer at the time and they were getting a shower every night when they got the head lice?

A: It was probably three times a week.

Court: And you were living in that trailer that she is in now?

A: Yeah.

Q: Was [Mother's] home clean at the time that you were living there?

A: So so.

Q. Did you feel like it was safe and appropriate for your children to be there at that time?

A: Other than Chastity, yeah.

Furthermore, the trial court's findings of fact detailed in the January 7, 2011 order make it clear that the trial home visit was terminated for several reasons besides the children's head lice and Chastity's presence in the home.

The termination of the trial home visit is not an issue on appeal and, as we explain below, the record contains plenty of other evidence that clearly and convincingly supports the termination of Father's parental rights. Therefore, the admission of Ms. Coffman's testimony does not affect a substantial right.

## II. Abandonment

Father argues that "[i]n the present case, DCS has not clear[ly] and convincingly proven abandonment of the child[ren] . . . ." The trial court found that Father abandoned Frankie, Jenny, and Penny within the meaning of Tennessee Code Annotated section 36-1-113(g)(1). The final decree specifically refers to abandonment as defined in section 36-1-102(1)(A)(ii):

The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

The record clearly and convincingly supports the trial court's finding that during the four-month period following the children's removal, December 4, 2009, through April 4, 2010, Father made no reasonable efforts to provide a suitable home and demonstrated a lack of concern for the children such that it appeared unlikely that he would be able to provide a suitable home for them at an early date. Rather than pointing to evidence that refutes this finding, Father argues that "the DCS case worker noted that [he] had improved his situation since separating from the mother, Penny [V.]." The fact that Father obtained a residence separate from Mother's in *February 2011* and began to improve his situation at that time is not relevant to any reasonable efforts he could have made during the four months following the children's removal from his home. Furthermore, as the trial court noted, "[Father] was advised on 1-6-10, 6-14-10, 12-7-10, and 2-17-11 that failure to make reasonable efforts to establish a suitable home for the children *in the first four months the children were in custody* was grounds for termination of parental rights" (emphasis added).

Lauren Coffman explained DCS's and Father's reasonable efforts:

Q. Let me go back and ask you, in that first four month period, again, just December 4th of 2009 to April 4th of 2010, during that four month period, what were the reasonable efforts that [DCS] made to assist [Father] and [Mother] in establishing a suitable home for the children?

A. We arranged in-home parenting education for them. We also . . . that was free. We provided home visits, random home visits to the home. We provided visitations. We also remained in contact with providers to ensure that they were cooperating with the services that were put into the home.

Q. OK. In that first four month period did you assist [Father] in looking for employment?

A. I did that, as well. I constructed some letters for [Father] . . . to [Father] letting him know of several agencies in the community that could assist him with finding employment.

Q. Did you arrange for both [Mother] and [Father] to obtain non-offender sex abuse counseling?

A. I did that, as well. I arranged that with Mr. Scott Herman.

Q. OK. And did you notify them both of the appointment dates and times?

A. I did that as well. I sent them that in a letter attached to a map to Mr. Herman's office.

Q. Now, did the parents make reasonable efforts to comply with these services you were offering them to establish a suitable home?

A. No, ma'am.

Q. What was it that leads you to that opinion that they did not make reasonable efforts?

A. During those first four months they did have a residence in Baxter, Tennessee. There was a period of time where they did not have a residence and I did not know where they were residing at. During the last few weeks of that time period they did get a home in Sparta during that time period. So there was a lot of instability in that home situation during that time period.[11]

---

[11] DCS was willing to assist Father with finding housing and paying housing deposits while he was without a residence, but he never asked for DCS's assistance.

Q. During most of the four month period, is that what you're saying, that they did not have a home?

A. Yes, ma'am.

DCS's efforts to assist Father in establishing a suitable home for his children certainly exceeded Father's efforts toward that same goal.

The trial court also found that Father's lack of reasonable efforts during the first four months of the children's removal included "remaining unbelieving and non-protective of Ricky V[.'s] sexual exploitation of Penny and Jenny [V.] and sexual battery of a 12-year-old girl." Ms. Coffman testified that while "[Father] wasn't as verbal as [Mother]" in denying that Ricky had taken nude photos of Penny and Jenny, he never admitted that Ricky had abused his daughters. Father's refusal to acknowledge his daughters' abuse coupled with the fact that he had previously allowed Ricky to sleep unsupervised in the same room as Jenny and Penny caused concern that he would be unable to protect them from further abuse, especially because Ricky was expected to return to Mother and Father's home upon his release from DCS custody.

In sum, the facts, as found by the trial court and as supported by the preponderance of the evidence, clearly and convincingly establish that Father abandoned his children within the meaning of Tennessee Code Annotated section 36-1-113(g)(1).

### III. Substantial Noncompliance with the Permanency Plans

The purpose of a permanency plan[12] is to make sure all parties understand what is required of them. Parents face significant consequences for failing to comply with the plan because substantial noncompliance by the parents with their responsibilities under the parenting plan is a ground for termination of their parental rights. Tenn. Code Ann. § 36-1-113(g)(2). Of course, for a parent to be in jeopardy of losing parental rights, the noncompliance with requirements in a permanency plan must be substantial and relevant. Failing to meet requirements that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parents' custody is not relevant for purposes of Tenn. Code Ann. § 36-1-113(g)(2). *In re Valentine,* 79 S.W.3d at 548-49. Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. *Id.*

---

[12] *See supra* note 5.

Here, the permanency plan requirements were reasonably related to remedying the conditions that caused Frankie, Jenny, and Penny's removal, and, as discussed above, DCS made reasonable efforts to assist Father in complying with those requirements. Father admits that he failed to meet several of the permanency plan requirements. For example, in spite of Ms. Coffman's informing Father that he needed to apply for TennCare and provide her a denial letter so that DCS could pay for the LifeCare counseling, he stated that he did not follow through with the LifeCare recommendations[13] because he did not have insurance and because his friends told him "that a single male could not get TennCare." Father did not take advantage of Ms. Coffman's offer to fill out the TennCare forms for him and did not apply for TennCare himself until approximately two weeks before trial. Additionally, Father failed to provide a safe, suitable home for his children for the majority of the time between their initial removal and trial. Father eventually acquired separate housing, but it is in Mother's back yard and he plans to have Mother watch the children if they are returned to him. Father has also failed to provided DCS with check stubs or other verification of his current job. We have carefully studied the record, and it supports the trial court's findings that Father has not maintained a safe and stable residence, that during the trial home visit he did not ensure that the children regularly bathed, that he failed to complete the parenting counseling recommended by LifeCare, that he allowed persons under the influence of drugs and/or alcohol to be around the children, and that he has failed to provide support to the children. Because clear and convincing evidence exists of Father's substantial noncompliance with the permanency plans, we affirm the trial court's termination of his parental rights.

While we affirm the trial court's decision that termination of Father's parental rights is appropriate pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and (2), we note that Father did not challenge the trial court's determination that termination of his parental rights is also appropriate pursuant to Tenn. Code Ann. § 36-1-113(g)(3).[14] This subsection provides an independent ground for termination of Father's parental rights, regardless of our decision concerning subsections (g)(1) and (2). Although Tennessee Code Annotated section 36-1-113 "sets out multiple possible grounds for termination of parental rights, only one of those grounds need be proven for a valid termination to be ordered, so long as that ground is proven by clear and convincing evidence, and it is also proven that

---

[13] Following the termination of the trial home visit, LifeCare recommended counseling specifically tailored to Father's needs. The counseling would have addressed parenting techniques, boundaries, and other concerns about Father's parenting. Father did not attempt to comply with LifeCare's recommendations until three weeks before trial.

[14] Tenn. Code Ann. § 36-1-113(g)(3) allows for the termination of parental rights where a child has been removed from the parent's custody for a period of six months and the conditions which led to the child's removal persist.

-11-

termination is in the best interest of the child or children." *In re H.E.J.*, 124 S.W.3d 110, 113 (Tenn. Ct. App. 2003).

## IV. Best Interest

Having concluded that clear and convincing evidence supports the statutory grounds upon which Father's parental rights were terminated, we must consider whether it was in Frankie, Jenny, and Penny's best interest to terminate Father's parental rights. In making this determination, the trial court was required to examine the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113(i). Ascertaining whether termination is in a child's best interest is necessarily a fact-intensive inquiry. *In re Giorgianna H.*, 205 S.W.3d 508, 523 (Tenn. Ct. App. 2006). Moreover, the best interest analysis "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

The record contains ample testimony that Frankie, Jenny, and Penny's best interests would be served by remaining with the loving foster parents who have taken care of them for almost a year and a half. In determining that termination of Father's parental rights is in the children's best interest, the trial court made the following findings:

> [Mother] and [Father] have not made an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest to be in the home of the parent.

> [Mother] and [Father] have failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible.

> The physical environment of [Mother] and [Father's] home is unhealthy and/or unsafe for the children.

> There is criminal activity in [Mother] and [Father's] home, in that they have allowed an adult child who was abusing cocaine to live in the home.

> [Mother's] and [Father's] mental and/or emotional status would be detrimental to the children and/or prevent them from effectively providing safe and stable care and supervision for the children.

[Father] has not paid child support consistently with the child support guidelines promulgated by [DCS] pursuant to Tenn. Code Ann. § 36-5-101.

[Mother] and [Father] have not paid a reasonable portion of the children's substitute physical care and maintenance when financially able to do so. They have not provided food, clothing or toiletries, and have only provided a few gifts.

[Mother] and [Father] continue to make lifestyle choices that prevent them from being able to parent the children or to provide a home for the children.

The children are placed in a foster home that wishes to adopt the children.

The children have established a strong bond with the foster parents.

The children have a desire to be adopted.

The children need to be released from the stigma of being foster children.

Father does not take issue with the trial court's best interest determination, and we find that it is supported by clear and convincing evidence.

CONCLUSION

For the reasons discussed above, we affirm the trial court's decision. Costs of appeal are assessed against the appellant, James W., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE